UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| SHANNON MAYNE YOUNG and BRANDY YOUNG, | )<br>)<br>) |
| Plaintiffs, | )<br>) |
| v. | ) No. 3:05-0947<br>) JUDGE ECHOLS<br>) |
| AFFILATRICI 3M and FEINMECHANIK MICHAEL DECKEL GMBH & CO., | )<br>)<br>)<br>) |
| Defendants. | )<br>) |

## MEMORANDUM

Plaintiff Shannon Mayne Young ("Young"), together with his wife Brandy Young, filed this products liability and negligence action against Defendants Feinmechanik Michael Deckel GmbH & Co. ("FMD") and Affilatrici 3M ("Affilatrici") as a result of injuries Young allegedly sustained while using a grinder manufactured by Affilatrici for FMD. Defendant FMD has filed a Motion to Dismiss for Lack of *In Personam* Jurisdiction (Docket Entry No. 18) to which Plaintiffs have responded in opposition (Docket Entry No. 49). Defendant Affilatrici has also filed a Motion to Dismiss for Lack of Personal Jurisdiction (Docket Entry No. 24) to which Plaintiffs have responded (Docket Entry No. 51) and Affilatrici has replied (Docket Entry No. 62). Plaintiff filed a supplemental response to both Motions (Docket Entry No. 69 **sealed**).

### I. FACTS AND THE PARTIES' CONTENTIONS

**A. General Overview**

Plaintiffs are citizens and residents of the State of Tennessee. (Third Amended Complaint ¶ 1 ("Complaint")). Defendant Affilatrici, the manufacturer of the FMC S 18 PCNC-5 tool grinder

1

at issue in this case ("the grinder"), is a foreign corporation with its principal place of business in Venezia, Italy. (Id. at ¶¶ 2-3; Docket Entry No. 19, Ex. 1). It has fewer than nine employees, (Mason Decl. ¶ 2), and apparently has no officers or employees in the United States. Defendant FMD is a foreign corporation located in Weilheim, Germany, with a subsidiary corporation, Deckel Grinders, Inc. ("Deckel") located in Waterbury Connecticut.[1] FMD is in the business of designing, manufacturing, and selling high precision tool grinding machines. (Id. at ¶ 5).

FMD ordered the grinder at issue from Affilatrici, its manufacturer, on May 3, 2000. The grinder was manufactured according to FMD's specifications and Affilatrici affixed the name and logo of FMD to the grinder. (Id.). On July 7, 2000, at the direction of FMD, Affilatrici shipped the grinder directly to FMD's Deckel subsidiary in Connecticut (id.), where it remained as a model in Deckel's showroom for approximately one year. (Complaint ¶ 5).

**B. Plaintiffs' Contentions**

Young was employed by the EJ Company ("EJ") in Woodbury, Tennessee. Bryan Francis ("Francis") owns and operates EJ.

In September 2000, Francis visited the International Manufacturing Technology Show in Chicago, Illinois, where he came in contact with representatives of Deckel and viewed an FMD S 18 PCNC-5 grinder. (Francis Aff. ¶ 3).[2] At some point near this same time, William Petrey

---

[1] At the time of its incorporation in Connecticut in 1997, FMD owned 52% of the shares of Deckel. By 2000, that ownership had risen to 67% and by May of 2003 FMD owned 100% of Deckel. In July 2003, Deckel stopped doing business and is presently in the process of being judicially dissolved. (Id.).

[2] That trade show is an "international event" which is advertised in trade magazines and attended by "[p]eople from all over the United States." Id.

2

("Petrey"), a vice president and national sales representative of Deckel, visited EJ in Woodbury, Tennessee.

Petrey testified in his deposition in this case that Deckel was the North American sales and service arm for FMD products and part of his job was to promote growth of FMD's products in America. (Petrey Depo. at 9, 42). It was his responsibility to organize and develop a sales organization through distributors for the Deckel line, and Deckel was to be the technical support arm for the sales organization and application-related projects. (Petrey Depo. at 5). Towards that end, and with FMD's knowledge, Petrey distributed brochures of FMD's products and attended trade shows yearly, including the one in Chicago. (Petrey Depo. at 20, 46). Deckel sold FMD's products in all but one state, and FMD was aware that its products were being sold and marketed in the United States. (Petrey Depo. at 50-51).

After being hired by Deckel, Petrey was trained at FMD in Weilheim, Germany for approximately ten days on machine technology and application. He returned to Weilheim at least once a year for continued training or to take customers to the factory. (Petrey Depo. at 7-9). For their part, FMD employees visited Deckel in Connecticut about once a year. (Petrey Depo. at 30-31).

As a sales arm of FMD, Deckel did not manufacture any parts. Instead, Deckel ordered parts and programs from FMD and a few single source suppliers in the United States. (Petrey Depo. at 11). The relationship between Deckel and FMD was set forth in a Sales Agreement, which has been placed under seal in this case. The Agreement can be generally summarized as granting Deckel the exclusive right to sell and distribute FMD's grinders in "the state territory of the USA, Canada and Mexico." (Agreement §§ I.1 & II.1). Deckel was to use its best efforts to promote FMD's grinder

3

(including advertising); not promote competitor's products; keep a customer list to be turned over to FMD at least yearly; and provide technical support and repair services. (Id., Art. III & IV). For its part, FMD was to grant Deckel trade discounts; support Deckel's efforts to promote FMD's products; and refrain from appointing any other agents or dealers in the assigned territory. (Id., Art. IV).

During his visit to EJ in the fall of 2000, Petrey distributed pamphlets and/or brochures highlighting FMD's products. Petrey also met with Francis. (Complaint ¶ 5; Young Aff. ¶ 4; Petrey Depo. at 13-14).

After reviewing the material provided by Petrey and having seen a S 18 PCNC-5 grinder at the trade show, Francis and Young visited Deckel in Connecticut at some point prior to August 2001, to consider purchasing a grinder and see whether Young would feel comfortable with operating a grinder since he had never operated a grinder before. An oral deal was struck at the time, but, upon his return to Woodbury, Francis continued to negotiate regarding the price and software and accessories. Ultimately the grinder was purchased from Deckel for approximately $180,000 in early September 2001. (Complaint ¶ 5; Young Aff. ¶ 4).

The grinder purchased by EJ was shipped by truck from Deckel's office in Connecticut to EJ's plant in Woodbury, Tennessee on September 7, 2001. Approximately one month after its arrival, Reiner Hartman ("Hartman") from Deckel arrived at EJ to set up the machine and train Young. Hartman stayed approximately eight days. (Young Aff. ¶ 4).

After the grinder's installation and before the accident, Young called Hartman between seventy and one hundred times with questions or problems regarding the grinder. At some point in 2003, Francis told Young that Deckel had gone out of business and that any questions had to be

4

directed to "someone" in Germany. Prior to his injury, Young called FMD between ten and fifteen times with more questions about the grinder and usually spoke with "Leon." (Young Aff. ¶ 6). Francis also called FMD with questions or problems regarding the grinder approximately the same number of times prior to Young's injury. (Francis Aff. ¶ 11). Since purchasing the grinder, Francis has received advertisements from FMD advertising new products. (Francis Aff. ¶ 13).

On March 21, 2005, Young was injured while operating the grinder. According to his account, he was about halfway through resharpening an end mill when he saw sparks coming from the grinder, followed by a ball of fire which blew the doors open. The flames and heat burned Young, and he was airlifted to Vanderbilt Hospital for treatment. (Young Aff. ¶ 5).

**C. Defendants' Contentions**

FMD and Affilatrici assert they have not had any business contact with Tennessee. (Woehr Decl. ¶ 14; Mason Decl. ¶ 12). In this regard, they claim they have never (1) manufactured or sold any products in Tennessee; (2) shipped any of their products to purchasers or consumers in Tennessee; (3) maintained an office or facility of any kind in Tennessee; (4) conducted any business or been licensed or authorized to conduct business in Tennessee; (5) had any agents or employees living or working in Tennessee; or (6) had any agents or employees who regularly visited Tennessee on corporate business. (Woehr Decl. ¶¶ 8-11, 14, 16; Mason Decl. ¶¶ 4, 7, 8, 10, 14). Additionally, Defendants claim they have never (1) maintained any bank account or telephone listing in Tennessee; (2) paid taxes to the State of Tennessee; (3) maintained a post office box or mailing address in Tennessee; (4) been an agent for service of process in Tennessee; (5) owned, leased, or had interest in real property in Tennessee; or (6) contracted to insure or finance any person or property in Tennessee. (Woehr Decl. ¶ 12-15; Mason Decl. ¶¶ 7, 10, 11).

5

On April 13, 2000, FMD sold the grinder to Deckel, which served as FMD's independent dealer and representative for sales and service of FMD products in the U.S. market. (Woehr Decl. ¶¶ 7, 28). FMD claims it did not exercise control over sales made by its subsidiary, Deckel, or by any other U.S. sellers or retailers of its products. (Woehr Decl. ¶ 24.)

Because the grinder was manufactured by Affilatrici and shipped directly to Deckel, FMD never had physical possession of the grinder, nor did it own the grinder at the time of the sale to EJ or even know the grinder was being sold to a company in Tennessee. (Woehr Decl. ¶¶ 18, 19). With regard to the training of Young, FMD asserts that it did not operate or control Deckel's facility in Connecticut where the training took place and was unaware of Young until this lawsuit was filed. (Woehr Decl. ¶¶ 20, 21).

Affilatrici claims its sole involvement with the grinder was its manufacture pursuant to the specifications of FMD and the placing of FMD's logo on the machine as directed by FMD. According to Affilatrici, it merely manufactured and sold the grinder to FMD, which in turn sold it to Deckel[3], and Affilatrici was not involved in the sale or marketing of the grinder in any way.

Once FMD purchased the grinder from Affilatrici, Affilatrici shipped the grinder to Deckel as FMD had directed it to do, and it has no knowledge as to what happened to the grinder after it was shipped. (Mason Decl. ¶¶ 16-20).[4] Based on these facts, Affilatrici had no involvement or

---

[3] Affilatrici has never had any affiliation with or ownership interest in FMD or Deckel. (Mason Decl. ¶ 17).

[4] When manufactured, the grinder had an emulsified water cooling tank. At some point, this was replaced by an oil cooling tank, and Affilatrici claims it had no involvement or input into that process. (Mason Decl. ¶ 18).

6

knowledge of the sale of the grinder to EJ and never had any dealing or relationship with EJ whatsoever. (Mason Decl. ¶ 20).

## II. STANDARD OF REVIEW

The burden to establish the jurisdiction of the Court is on the Plaintiffs. Third Nat'l Bank v. Wedge Group Inc., 882 F.2d 1087, 1089 (6th Cir. 1989); Inter-City Prod. Corp. v. Willey, 149 F.R.D. 563, 570 (M.D. Tenn. 1993); Chenault v. Walker, 36 S.W.3d 45, 56 (Tenn. 2001). In considering a Motion to Dismiss for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2), the Court need not hold an evidentiary hearing, but may rely solely on the pleadings, affidavits, and other written submissions of the parties. See Third Nat'l Bank, 882 F.2d at 1089. If the Court proceeds in that manner, the burden on the Plaintiffs is relatively slight, as the Plaintiffs must make only a prima facie showing of jurisdiction. See Id. The Court must consider the facts in the light most favorable to the Plaintiffs. See Id.

## III. ANALYSIS

In a diversity action like this one, the Court determines whether it may exercise personal jurisdiction over non-resident Defendants by applying the law of the state in which the federal court sits, which is in this case the law of Tennessee. See Third Nat'l Bank, 882 F.2d at 1089; Willey, 149 F.R.D. at 571. Tennessee courts exercise personal jurisdiction to the full extent permitted by the Due Process Clause of the Fourteenth Amendment. Bridgeport Music, Inc. v. Still N The Water Publishing, 327 F.3d 472, 477 (6th Cir. 2003); Third Nat'l Bank, 882 F.2d at 1089; Chenault, 36 S.W.3d at 52-53; United Agric. Serv., Inc. v. Scherer, 17 S.W.3d 252, 256 (Tenn. Ct. App. 2000). The Plaintiffs must show that the Defendants had sufficient minimum contacts with the forum such that "the maintenance of the suit does not offend 'traditional notions of fair play and substantial

7

justice.'" International Shoe Co. v. Washington, 326 U.S. 310, 316 (1945); Young v. Track, Inc., 324 F.3d 409, 417 (6th Cir. 2003).

"Minimum contacts" exist when the Defendants' conduct and connection with the forum state are such that the Defendants "should reasonably anticipate being haled into court there." World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980). The Defendants must purposefully avail themselves of the privilege of conducting activities within the forum state and thereby invoke the benefits and protections of the state's laws. Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985). This ensures that Defendants will not be haled into a particular forum on the basis of "random," "fortuitous," or "attenuated" activity, or by the unilateral activity of some other party or person. Id.; Young, 324 F.3d at 417.

A distinction is made between "general" jurisdiction and "specific" jurisdiction. Burger King Corp., 471 U.S. at 472, 473 n.15; Chenault, 36 S.W.3d at 52-53; Gregurek v. Swope Motors, Inc., 138 S.W.3d 882, 884-885 (Tenn. Ct. App. 2004). General jurisdiction may be exercised over nonresident defendants in a suit that "does not arise out of or relate to the contacts with the forum state but rather the defendant[s'] contacts with the forum state are so 'continuous and systematic' that jurisdiction is proper." Gregurek, 138 S.W.3d at 885; Youn, 324 F.3d at 418. "Specific jurisdiction is exercised over a defendant in a suit that directly arises out of or relates to one or more contacts that the defendant has with the forum." Gregurek, 138 S.W.3d at 885; Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414 n.8 (1984); Young, 324 F.3d at 418.

**A. General Jurisdiction**

In their memoranda in opposition to the Motions to Dismiss, Plaintiffs admit that whether the Court has general jurisdiction over the Defendants "is not an issue in this lawsuit" and that

8

"Plaintiffs have not alleged general jurisdiction over Defendant[s.]" (Docket Entry No. 50 at 9; 52 at 7). Based upon Plaintiffs' concessions and the submissions by Defendants regarding their contacts with Tennessee, the Court finds that the facts do not provide a basis for the exercise of general jurisdiction.

### B. **Specific Jurisdiction**

"Specific jurisdiction 'subjects the defendant to suit in the forum state only on claims that arise out of or relate to defendant's contact with the forum.'" Fortis Corporate Ins. v. Viken Ship Mgmt., 450 F.3d 214, 218 (6th Cir. 2006) (citation omitted). The exercise of specific jurisdiction over a non-resident defendant is valid only if it meets both the state long-arm statute and constitutional due process requirements. Calphalon Corp. v. Rowlette, 228 F.3d 718, 721 (6th Cir. 2000).

Tennessee's long-arm statute provides for jurisdiction to the full extent allowed under the due process clause relating to "the transaction of any business within the state"; "any tortious act or omission within this state"; "the ownership or possession of any interest in property located within this state"; or "entering into a contract for services to be rendered or for materials to be furnished in this state." T.C.A. § 20-2-214(a)(1), (2), (3), and (5). Section 20-2-214(c) also permits the exercise of personal jurisdiction over a defendant when he undertakes any of the above actions through an "agent or personal representative." T.C.A. § 20-2-214(c).

The Sixth Circuit has set forth three criteria for determining whether specific jurisdiction may be exercised consistent with due process. Those criteria are:

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection

9

with the forum state to make the exercise of jurisdiction over the defendant reasonable.

Southern Machine Co. v. Mohasco Indus., Inc., 401 F.2d 374, 381-382 (6th Cir. 1968). The purposeful availment prong of the test is viewed by the Sixth Circuit "as 'essential' to a finding of personal jurisdiction." Intera Corp. v. Henderson, 428 F.3d 605 (6th Cir. 2005).

"In the Sixth Circuit, the emphasis in the purposeful availment inquiry is whether the defendant has engaged in some overt actions which connect the defendant with the forum state." Fortis, 450 F.3d at 218 (internal citations and quotations omitted). In making that inquiry, the Sixth Circuit utilizes the "stream of commerce plus" test espoused by Justice O'Connnor in her plurality opinion in Asahi Metal Indus. Co. v. Superior Court of Calif., 480 U.S. 102 (1987). Fortis, 450 F.3d at 220. Justice O'Connor set forth the test as follows:

> The placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State. Additional conduct of the defendant may indicate an intent or purpose to serve the market in the forum State, for example, designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State. But a defendant's awareness that the stream of commerce may or will sweep the product into the forum State does not convert the mere act of placing the product into the stream into an act purposefully directed toward the forum State.

Asahi, 408 U.S. at 112.

In this case, the Court finds sufficient evidence to support the conclusion that FMD purposefully availed itself of acting or causing a consequence in Tennessee. However, the same cannot be said about Affilatrici.

10

### 1. *Specific Jurisdiction Over FMD*

Based upon the evidence presented, and given that the burden on Plaintiffs is "relatively slight," the Court finds it has specific jurisdiction over FMD. Not only did FMD purposefully avail itself of doing business in Tennessee, the cause of action arose from that Defendant's activities in Tennessee. Therefore, the exercise of jurisdiction over FMD is reasonable.

FMD argues that the grinder, which was manufactured not by it but by Affilatrici, was sold to EJ by a Connecticut corporation, not FMD, and FMD's only relationship to the grinder was that it ordered the grinder for shipping to Deckel and Deckel sold it to EJ without FMD's knowledge. (Docket Entry No. 19 at 10). Such an argument, which basically casts Deckel into the role of an independent broker, ignores other evidence which suggests a much more symbiotic relationship between FMD and Deckel.

The evidence shows that EJ purchased a $180,000 grinder that had FMD's logo on it and which was represented to be a FMD product. The grinder was manufactured by Affilatrici according to FMD's exact specifications. The grinder was shipped by Affilatrici to Deckel, FMD's subsidiary and sales arm in the United States. Afterwards, the grinder was shipped by truck to EJ where it was installed in the plant in Woodbury, Tennessee. Tennessee residents, including Young, were trained on the grinder initially, and at least once a year by FMD's employees in Weilheim, Germany. Also FMD's employees visited its subsidiary, Deckel, in Conneticut, approximately once a year.

While FMD claims no knowledge of the shipment and installation, FMD cannot claim that it could not conceive its grinders were being sold and shipped to Tennessee. FMD was the majority (and later sole) shareholder of Deckel, the seller and shipper of the grinder, and Deckel has an exclusive Sales Agreement to market, sell, and distribute FMD's grinders in the United States. As

11

the marketing arm for FMD in the United States, Deckel's primary responsibility was to advertise FMD's products and to increase the sale of FMD's grinders in the United States. Deckel's representatives and customers visited FMD's office in Germany. FMD representatives in turn visited the Deckel facility in the United States. Deckel's representatives, with the knowledge and approval of FMD, advertised FMD's products in the United States, made sales calls (including the one to EJ in Tennessee), attended trade shows to show and market FMD's products where they handed out brochures, and made sales of FMD products in forty-nine states. All of these activities were in keeping with the Sales Agreement between Deckel and FMD. When problems with the grinder at issue in this case arose after Deckel had ceased doing business, it was FMD which responded to the inquiries from EJ.

These facts are analogous to those in Mott v. Schelling & Co., 1992 WL 116014 (6th Cir. 1992).[5] There, Plaintiff, a Michigan resident, was injured while operating an industrial saw manufactured by Schelling, an Austrian-based company. The saw at issue was sold to Schelling's agent, the Proctor Corporation in Birmingham, Alabama, at which point Proctor was granted title to the saw from Shelling.

Schelling argued it was not subject to the specific jurisdiction of the Michigan courts because it had no contacts with that state. With regard to Schelling's contact with the United States, and more specifically Michigan, the Sixth Circuit observed:

> Schelling's plant and headquarters is located in Austria. However, Schelling sells
> saws and other industrial equipment all over the word [sic]. Schelling has always

---

[5]Mott is not cited or discussed by the parties, perhaps because it is an unpublished opinion. However, Mott was discussed extensively by the Sixth Circuit in Fortis, 450 F.3d at 220-221 and Tobin v. Astra Pharmaceutical Products, Inc., 993 F.2d 528, 544 (6th Cir. 1993) and quoted with approval in both cases.

12

> maintained an exclusive American sales agent for the sale and resale of its specialized product in the American market. Schelling sold the saw at issue in this case through the Proctor Corporation, its exclusive sales agent during the relevant time period. Proctor is no longer in business[.] Proctor performed various services on behalf of Schelling, including installation and repair as well as trade-in and resale of used models. As Schelling changed American sales agents, these services became available to prior customers through the new distributors.
>
> Schelling actively cultivated its American market. United States standards were taken into account in the design and manufacture of the saw at issue. Schelling employees, including Franzjorg Schelling himself, have come to the United States to market and sell these machines[.]
>
> Modar, Mott's employer, bought two of the Schelling saws and both are still in operation at its Michigan plant. Technically, these saws were sold to Knape and Vogt, Modar's parent, by Proctor, since title to the saws passed to Proctor when Schelling shipped them to the United States. However, the passing of title to Proctor and then immediately to Modar is an artifice that is unhelpful for the personal jurisdiction analysis[.]

Mott, 1992 WL 116014 at 5.

As with any two cases, there are some factual differences between the facts in this case and Mott. For example, in this case the grinder was not manufactured by FMD, whereas the saw in Mott was manufactured by Schelling. However, the grinder was manufactured to the specifications required by FMD. Also, unlike in Mott, Defendant's representatives did not install and adjust the grinder, but, tellingly, they did provide support after Deckel ceased to do business.

There are, however, many similarities between the facts relating to the actions of Defendant FMD in this case and those of the defendant in Mott, including: both sold specialized industrial equipment all over the world; both actively cultivated the American market; both maintained a marketing agent in the United States for the sale of products in the American marketplace, neither of which at the time of the events in question was in operation; the sales agent in both cases performed various services on behalf of the defendant, including installation and repair of products and when the agents became unavailable those services were assumed by a new agent; and both

13

defendants had brochures disseminated in an effort to sell its products. These similarities are such that this Court finds the following language from Mott is applicable to FMD and its activities in this case:

> Schelling knew its saws were being sold in the United States. The company actively cultivated its market here, and benefited [sic] from numerous U.S. sales, including the one in this case, over many years. Clearly Schelling cannot reasonably expect to sell a potentially dangerous product into the United States, exact its price, and then shirk any obligations that arise when its machine goes awry. Due process does not require us to allow Schelling to exploit this country's vast, rich markets and at the same time avoid the jurisdiction of our courts.

Id. 1992 WL 116014 at *6.

As FMD itself recognizes, the question under the Supreme Court's holding in World-Wide Volkswagen relating to purposeful availment is whether "defendant delivered the product into the stream of commerce with the expectation that it would be purchased or used by consumers in the forum state." (Docket Entry No. 19 at 9). Given the record as it presently exists before the Court, that question must be answered in the affirmative in relation to FMD. See Burger King Corp., 471 U.S. at 473 (a court does not offend the Due Process Clause by exercising jurisdiction over a manufacturer who "delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum state and those products subsequently injure forum consumers").

Having concluded that FMD purposefully availed itself of the benefit of doing business in Tennessee, two issues remain. The first is whether the cause of action arose out of FMD's actions in the forum state. There is a "lenient" threshold for meeting this requirement, Bird v. Parsons, 289 F.3d 865, 875 (6th Cir. 2002) and that threshold is met here because the injury occurred in this state as a result of FMD causing its grinder to be sold in Tennessee. See Tobin, 993 F.2d at 544

14

(second element is met where plaintiff ingested drug which defendant caused to be shipped to forum state).

Second, the Court must consider the reasonableness of exercising jurisdiction over FMD. An inference arises that this factor is met where the purposeful availment and cause of action prongs exist. Bird, 289 F.3d at 875. Nevertheless, "great care and reserve should be exercised when extending our notion of personal jurisdiction into the international field[,]" Fortis, 450 F.3d at 223, and the factors to be considered include "the burden on the defendant of litigating in the forum, the interest of the forum state, the plaintiff's interest in obtaining convenient and effective relief, and the shared interest of the several states in furthering fundamental substantive social policies." Tobin, 993 F.2d at 545. Those factors weigh in favor of finding that it is reasonable to exercise jurisdiction over FMD in this case.

While there will be unique burdens placed upon FMD insofar as it will be required to defend itself in a foreign legal system, FMD has shown a willingness to exploit the United States market, id., and has shown some ability to defend itself across international borders, Fortis, 450 F.3d at 223. On the other hand, Tennessee has a strong interest in insuring that products reaching this state are safe for their intended use and Plaintiffs' "interest in obtaining relief here is particularly keen, because . . . plaintiff[s] only sued foreign defendants (and not U.S. parties), which is [their] only means for obtaining relief." Fortis, 450 F.3d at 223. Balancing these factors, the Court finds that it is reasonable to exercise jurisdiction over FMD.

### 2. Specific Jurisdiction Over Affilatrici

While the Court finds more than sufficient evidence to conclude that jurisdiction over FMD is proper and reasonable, the same cannot be said with respect to Affilatrici. Unlike with FMD,

15

Plaintiffs have not presented evidence that Affilatrici had a sales distribution system which actively marketed its products in the United States or that it was the majority shareholder of such a distributor. Nor have Plaintiffs shown that Affilatrici was attempting to increase its stake in the United States market.

In an effort to support their personal jurisdiction argument in relation to Affilatrici, Plaintiffs rely upon the decisions in <u>Noel v. S.S. Kresge Co.</u>, 669 F.2d 1150 (6th Cir. 1982) and <u>Poyner v. Erma Werke GMBH</u>, 618 F.2d 1186 (6th Cir. 1980). Not only are those cases pre-<u>Bridgeport</u> in which the Sixth Circuit adopted the "stream of commerce-plus" test, they are inapposite on their facts.

In <u>Noel</u>, K-Mart purchased over 140,000 pliers from Greenhill & Kato of Osaka, Japan. After Plaintiff was severely injured using a pair of those pliers, he sued and K-Mart interpled Greenhill. The district court found personal jurisdiction over Greenhill, reasoning that a foreign distributor who sells to K-Mart could anticipate that its goods would wind up in Ohio since that was a "major market" for K-Mart. In upholding the trial court's decision, the Sixth Circuit observed that Greenhill was "familiar with K-Mart's operation as a nationwide retailer in the United States" and that this "very large order" was to be divided-up and sent to three different United States ports on both sides of the country. <u>Noel</u>, 669 F.2d at 1155. Here, to the contrary, one grinder (albeit an expensive grinder) was sent to a single location outside the forum state as directed by its customer, FMD, and there is little in the way of evidence to suggest that Affilatrici was affiliated with Deckel's operation in Connecticut. Hence <u>Noel</u> does not aid the Plaintiffs in establishing personal jurisdiction.

<u>Poyner</u> also does not aid Plaintiffs. There, the trial court erred in dismissing a German firearm manufacturer from a lawsuit brought by a Kentucky resident as a result of a gunshot wound

16

because there was evidence the manufacturer purposefully availed itself of acting in Kentucky as a "strong backstage promoter." That evidence included the manufacturer's engagement of an exclusive distributor in the United States; the manufacturer's awareness of the activities of the distributor's activities; efforts to maximize sales in America (including through the distribution of sales catalogues); and the existence of a salesman capable of servicing customers in Kentucky. Poyner, 618 F.2d at 1190-1191. While analogies might be made between those activities and the activities of FMD in this case, the same cannot be said about the activities of Affilatrici.

The record shows Affilatrici's involvement in this case to be isolated and simple. It manufactured the grinder in question pursuant to the specifications of FMD. Affilatrici sold the grinder to FMD and then shipped it to Deckel in Connecticut at FMD's direction. There is no evidence Affilatrici attempted to market the grinder or in fact knew what became of it after shipping the grinder to Deckel.

The evidence merely shows that Affilatrici entered the grinder into the stream of commerce. However, that is not enough under Asahi, 480 U.S. at 112. There must be a "plus" to the stream of commerce and that plus is missing with regard to Affilatrici. Accordingly, that Defendant's Motion to Dismiss will be granted.

## IV. CONCLUSION

On the basis of the foregoing, FMD's Motion to Dismiss for Lack of *In Personam* Jurisdiction (Docket Entry No. 18) will be denied. The motion of Affilatrici to dismiss for lack of personal jurisdiction (Docket Entry No. 24) will be granted and Affilatrici will be dismissed from

17

this action. The case will be returned to the Magistrate Judge for further proceedings consistent with

Local Rule 16.01.

      An appropriate Order shall be entered.

_____
ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE

18